UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                          Plaintiff,

          v.

LUIS GUZMAN,

                          Defendant.
_____

REPORT & RECOMMENDATION

13-CR-6118CJS

## PRELIMINARY STATEMENT

By Order of Hon. Charles J. Siragusa, United States District Judge, dated August

13, 2013, all pretrial matters in the above captioned case have been referred to this Court

pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 21).

On August 13, 2013, the grand jury returned a twenty-six count indictment

against Luis Guzman ("Guzman").  Counts One through Twenty-Two charge Guzman with

possession with intent to distribute and distribution of heroin (Counts One through Nineteen),

cocaine (Counts Twenty and Twenty-One), and marijuana (Count Twenty-Two), in violation 21

U.S.C. §§ 841(a)(1) and (b)(1)(C) and (D).  (Docket # 20).  Counts Twenty-Three and

Twenty-Four charge Guzman with use and possession of a firearm in furtherance of drug

trafficking crimes, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  (*Id.*).  Count Twenty-Five

charges Guzman with possession and sale of a stolen firearm, in violation of 18 U.S.C. §§ 922(j)

and 924(a)(2).  (*Id.*).  Count Twenty-Six charges Guzman with possession of a firearm with an

altered and obliterated serial number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B).  (*Id.*).

Currently pending before this Court is Guzman's motion to suppress statements and evidence of a photographic identification.[1]  (Docket ## 26, 39).  For the reasons discussed below, I recommend that the district court deny Guzman's motion.


## FACTUAL BACKGROUND

### I.   March 28, 2013 Arrest of Guzman

This Court conducted an evidentiary hearing on November 22, 2013 concerning the circumstances surrounding Guzman's arrest and statements he made following that arrest. (Docket # 31).[2]  During the hearing, the government offered testimony from Edmund Bernabei ("Bernabei") and Sammy Diaz ("Diaz").  (Tr. 4-107).

### A.    Testimony of Bernabei

Bernabei testified that he has been employed by the Rochester Police Department ("RPD") for approximately twenty-four years and works as an investigator.  (Tr. 4-5).  He is currently assigned to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") task force.  (Tr. 5).

Bernabei testified that on March 28, 2013, at approximately 5:30 p.m., he arrived at 24 Holland Street, Rochester, New York in order to arrest and interview Guzman.  (Tr. 13-14, 31-33).  At the time, he had neither a warrant to search the premises nor a warrant for Guzman's arrest.  (Tr. 33, 46).  Bernabei was accompanied by Special Agent Malcolm Van Alstyne ("Van Alstyne"), Special Agent Patrick Hoffman ("Hoffman") and Officer Brian Schirmer

---

[1]   In his omnibus motion, Guzman also sought, *inter alia*, discovery and inspection, Rule 404(b), 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 26). Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on October 31, 2013.  (Docket # 29).

[2]   The transcript of the November 22, 2013 hearing shall be referred to as "Tr. __."  (Docket # 31).

("Schirmer").  (Tr. 14).  Bernabei and the other law enforcement officers were dressed in plain clothes and arrived in unmarked vehicles.  (Tr. 14, 32, 36, 45-46).  According to Bernabei, both he and Van Alstyne visibly displayed their badges outside their clothes.  (Tr. 37).  None of the law enforcement officers present at 24 Holland Street spoke Spanish.  (Tr. 32).

Bernabei and Van Alstyne approached the door to the residence without displaying their guns, while the other law enforcement officers moved to monitor the perimeter of the residence.  (Tr. 14-15, 35).  According to Bernabei, he knocked on the exterior screen door of the premises; the interior door to the premises was already open.  (Tr. 15, 34, 37).  Guzman, who was on the phone, came to the screen door, and Bernabei and Van Alstyne identified themselves in English and asked Guzman if he would talk to them and if they could enter the residence.  (Tr. 15, 37-38).  According to Bernabei, Guzman responded "yes" in English and partially pushed open the screen door, which Van Alstyne then opened further.  (Tr. 15, 38, 65-66).  Bernabei and Van Alstyne entered the residence, and Schirmer and Hoffman later joined them inside.  (Tr. 15, 38-40).

Bernabei and Van Alstyne asked Guzman whether anyone else was in the residence, and Guzman informed them that the woman who lived there was not at home, but was expected to return shortly.  (Tr. 16).  Guzman asked the officers to explain the purpose of their visit; they replied that they wanted to talk to him about some crimes he had committed, that he was under arrest and that he needed to accompany them downtown to be interviewed.  (Tr. 16, 40-41).  According to Bernabei, Guzman agreed to go with them, and the officers secured the house and left the residence with Guzman.  (Tr. 16, 41-42).  Bernabei testified that Guzman and the law enforcement officers spoke English throughout their encounter at 24 Holland Street.  (Tr. 39, 65-66).

Guzman was placed without handcuffs into the back of an unmarked car and driven to the Public Safety Building. (Tr. 16, 41). Bernabei could not recall whether he had spoken with Guzman during the ride, but testified that any conversation would have been unrelated to the investigation. (Tr. 45). According to Bernabei, the drive took approximately twelve minutes. (Tr. 43-44; Government's Exhibit ("G. Ex.") 4).

Following the hearing, the government submitted a recording of the phone call that Guzman was on when the officers arrived at 24 Holland Street. At the beginning of the recording,[3] Guzman conversed in Spanish with a female. Guzman later spoke in English with a male. At one point during the conversation with the male, Guzman told the male to wait for a moment. At that point, the officers' arrival at 24 Holland can be overheard. Guzman greeted the officers, stating, "What's up?" Bernabei and Van Alstyne introduced themselves and asked Guzman, "You by yourself?" Guzman responded, "Yeah." They asked, "Can we come in?" Guzman again replied, "Yeah." Guzman explained that the owner of the house was not home, but would return shortly. The recording concludes shortly thereafter.

Guzman arrived at the Public Safety Building at approximately 5:40 p.m. (Tr. 24; G. Ex. 4). He was placed in an interview room on the third floor, still un-handcuffed, and was interviewed by Bernabei, Hoffman and Border Patrol Agent Diaz. (Tr. 16-18). Bernabei testified that the interview room was approximately six feet by six feet and contained a table and chairs. (Tr. 17). According to Bernabei, Diaz, a Spanish-speaking officer, was present because Guzman was known to speak Spanish and English, and the officers wanted to facilitate communication with Guzman. (*Id.*). Diaz was also part of the investigative team and participated in questioning Guzman, sometimes in English. (Tr. 47-48).

---

[3] The government submitted a lengthy portion of the recording. The Court has listened only to those portions of the recording to which the government directed its attention.

After entering the interview room, the officers again identified themselves, and Bernabei asked Guzman if he needed any water or to use the restroom. (Tr. 18). Guzman declined both. (*Id.*). At that point, Diaz advised Guzman in Spanish of his *Miranda* rights by using a Spanish RPD notification and waiver card. (Tr. 19, 49). Diaz handed Guzman the card, and Guzman signed it. (Tr. 51). Hoffman then re-advised Guzman in English of his *Miranda* rights using an English RPD rights card.[4] (Tr. 19-20, 49-50; G. Ex. 2). According to Bernabei, Hoffman read the rights verbatim from the card, after which he read the two questions at the bottom of the card. (Tr. 21, 50). In English, Guzman responded "yes" to both questions. (Tr. 21-22). According to Bernabei, Hoffman recorded Guzman's responses on the card. (Tr. 22).

Bernabei testified that following the advice of rights, the officers began to question Guzman. (*Id.*). According to Bernabei, Guzman responded in English to many questions, but sometimes responded in Spanish to Diaz, which Diaz then translated into English for Hoffman and Bernabei. (Tr. 22-23, 28, 66-67). Bernabei testified that Diaz also translated questions into Spanish from time to time. (Tr. 27). Guzman never complained that he was unable to understand Diaz. (Tr. 27-28). According to Bernabei, Guzman's answers were coherent in English and in Spanish. (Tr. 28-29).

Bernabei testified that Guzman never indicated in English or Spanish that he did not want to speak with the officers, that he wanted to speak with an attorney or that he was

---

[4] The RPD Notification and Waiver Card provided:

1. You have the right to remain silent - you do not have to say anything if you don't want to.
2. That anything you do say can be used against you in a court of law.
3. You have the right to talk to a lawyer before answering any questions and have him here with you.
4. If you can't pay for a lawyer, one will be given to you before any questioning if you wish.
5. If you do wish to talk with me, you can stop at any time.

(G. Ex. 2).

suffering from any illness, injury or medical condition.  (Tr. 25-27).  In addition, Bernabei

testified that he and the other officers did not have their firearms and did not use or threaten force

against Guzman.  (Tr. 26).  According to Bernabei, the possibility of cooperation was never

discussed with Guzman during the interview.  (Tr. 54-55).  Bernabei testified that Guzman was

calm and appeared sober throughout the interview.  (Tr. 27).  At the conclusion of the interview,

Guzman was informed that he would be charged with criminal sale of a firearm and criminal sale

of a controlled substance.  (Tr. 29-30).

       Bernabei originally testified that the entire interview lasted approximately

fifty-five minutes, but after reviewing the interview log form, clarified that the interview lasted

approximately two hours, although Guzman was in the interview room for approximately four

hours.  (Tr. 23, 52-53; G. Ex. 4).  Bernabei testified that Guzman was offered water and the use

of a restroom during a break in the interview.  (Tr. 25).

    **B.**    **Testimony of Diaz**

       Diaz testified that he has been employed by the United States Border Patrol for

approximately twelve years and had been assigned to the ATF task force for the past eighteen

months.  (Tr. 68).  Diaz testified that he is able to read, write and understand the English and

Spanish languages and to translate from one to the other.  (Tr. 69).

       Diaz was involved in the investigation of Guzman, primarily by translating

telephone communications that had been intercepted pursuant to a court-authorized wiretap.  (Tr.

83, 104-05).  According to Diaz, Guzman was intercepted over the wiretap speaking in both

English and Spanish.  (Tr. 105).  Diaz explained that Guzman consistently spoke Spanish during

communications to particular phone numbers and English in communications to others.  (*Id.*).

Diaz estimated that approximately 70% of Guzman's intercepted phone calls were in Spanish,

and 30% were in English.  (*Id.*).  In fact, Diaz was monitoring the wiretap when Guzman was arrested.  (Tr. 83, 93-94, 105-06).

Diaz testified that he participated in the post-arrest interview of Guzman at the Public Safety Building.  (Tr. 70-71).  According to Diaz, after he and the other officers introduced themselves to Guzman, he advised Guzman in Spanish of his *Miranda* rights.  (Tr. 71, 84-85).  Diaz testified that he utilized a Spanish RPD notification and waiver card.[5]  (Tr. 71-73, 85; G. Ex. 3).  According to Diaz, he read the rights verbatim from the card.  (Tr. 73, 85).  He then read the first question on the card, which asked whether Guzman understood; Guzman responded affirmatively in both English and Spanish.  (*Id.*).  Diaz handed Guzman the card and told him to sign his name next to that question, which he did.  (*Id.*).  Diaz testified that Hoffman then advised Guzman in English of his *Miranda* rights.  (Tr. 73-74, 86).

Diaz testified that the officers primarily questioned Guzman in English.  (Tr. 74). According to Diaz, Guzman sometimes indicated that he did not understand the question, either by looking at Diaz or asking him to explain, and Diaz would translate the question into Spanish. (Tr. 74, 87).  Diaz estimated that approximately 90% of the interview was conducted in English. (*Id.*).  Diaz testified that Guzman primarily responded in English and used Spanish infrequently. (Tr. 74).  According to Diaz, Guzman did not appear to have difficulty understanding or

---

[5]  The RPD Notification and Waiver Card provided:

1. Usted tiene el derecho de guardar silencio, si no desea no tiene que decir nada.
2. Todo lo que usted diga puede ser usado en contra suya en una corte penal.
3. Usted tiene el derecho de consultar un abogado antes de contestar cualquier pregunta y si desea puede tener su abogado presente.
4. Si usted no puede pagar por los servicios de un abogado, se le proveerá uno antes de hacer le preguntas, si así lo desea.
5. Si usted decide hablar conmigo usted puede parar de hablar en cualquier momento.

(G.  Ex. 3).

comprehending Diaz's translations and responded coherently to the questions that were posed. (Tr. 77).

Diaz further testified that Guzman never indicated that he did not want to speak to law enforcement or that he wanted an attorney. (Tr. 75). Diaz described Guzman as "calm and relaxed" throughout the interview. (Tr. 76). In addition, Diaz testified that no one threatened or used force against Guzman to induce him to talk. (*Id.*). Diaz initially testified that the interview lasted approximately fifty minutes but, after reviewing the interview log, testified that Guzman was interviewed for approximately two hours in total. (Tr. 78-81).

## II.   <u>December 18, 2012 Photographic Identification</u>

Bernabei testified that on December 18, 2012, he and Van Alstyne conducted a photographic identification procedure with a confidential informant. (Tr. 5, 9). Prior to the identification procedure, which occurred in a vehicle, the informant had described Guzman as a thinly-built, dark-haired, light-skinned Hispanic male, who was approximately twenty to twenty-four years old and five foot, seven inches tall. (Tr. 6, 60, 64).

Bernabei asked the informant to review a photographic array and to indicate whether the informant recognized anyone depicted in the six photographs. (Tr. 9-10, 60). Bernabei testified that he could not recall the exact words that he used, but testified that it was his practice to ask the witness to identify any individual in the array whom the witness recognized, if anyone. (Tr. 60-61). Bernabei testified that he did not advise the informant to look at any particular photograph and did not indicate that any particular person might be present in the array. (Tr. 10). Within seconds, the informant pointed at the third photograph and identified the individual depicted as "Luis." (Tr. 10, 61). Bernabei testified that the informant

did not express any uncertainty or ask to review the array more than once.  (*Id.*).  Bernabei asked

the informant to circle the identified photograph, to record the informant's initials, to write the

name of the person depicted in that photograph, and to sign the array.  (Tr. 11).  The informant

circled photograph number three, wrote the name "Luis," placed the informant's initials next to

the photograph and signed his name at the bottom.  (Tr. 11-12, 62).  Bernabei and Van Alstyne

also signed the array.  (Tr. 12, 62-63; G. Ex. 1).

      Bernabei testified that his supervisor obtained Guzman's photograph from the

Department of Motor Vehicles.  (Tr. 6, 56-57).  According to Bernabei, he forwarded Guzman's

photograph to a graphic artist employed by RPD, who created the photographic array.  (Tr. 6,

57-58).  Bernabei believed that the other photographs in the array were obtained from the

MORIS system.  (Tr. 58-59).

      The array itself contained six photographs of different men, all of whom appear to

be Hispanic.  (G. Ex. 1).  Photograph three depicts Guzman.  (Tr. 8, 12; G. Ex. 1).  Guzman's

complexion and hair color are similar to the other individuals depicted.  (G. Ex. 1).  All six

appear to have light facial hair, are wearing an earring in their left ear and appear similar in age.

(G. Ex. 1).

### III.  Guzman's Affidavit

      In support of his suppression motion, Guzman submitted an affidavit stating that

he did not knowingly and voluntarily consent to the seizure of his person on March 28, 2013.

(Docket # 26-1 at ¶ 2).  In addition, Guzman stated that he was not advised of his *Miranda* rights

in a manner that allowed him to understand them, and did not knowingly and voluntarily waive

his rights and agree to speak with law enforcement officers.  (*Id.* at ¶ 3).  According to Guzman,

9

he did not feel that he could leave the Public Safety Building and felt compelled to answer the

questions posed by law enforcement.  (*Id.*).


### REPORT & RECOMMENDATION

I.      **Motion to Suppress Photographic Identification**

I turn first to Guzman's motion to suppress evidence of the photographic

identification.  (Docket ## 26, 39).

Evidence of an out-of-court photographic identification will be suppressed under

the due process clause if "the photographic identification procedure was so impermissibly

suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

*Simmons v. United States*, 390 U.S. 377, 384 (1968).  In determining whether to exclude

evidence of a pretrial identification, a court must first consider whether the identification

procedure was unduly suggestive.  *Id.*  To decide whether a photographic array is unduly

suggestive, a court should consider several factors, including "the size of the array, the manner of

presentation by the officers, and the array's contents."  *United States v. Maldonado-Rivera*, 922

F.2d 934, 974 (2d Cir. 1990), *cert. denied*, 501 U.S. 1233 (1991).  Specifically, the court must

consider "whether the picture of the accused . . . so stood out from all the other photographs as to

suggest to an identifying witness that [the accused] was more likely to be the culprit."  *Jarrett v.

Headley*, 802 F.2d 34, 41 (2d Cir. 1986) (internal citations omitted).

If the identification procedure was unduly suggestive, the court must proceed to

determine whether the identification nevertheless possesses "sufficient aspects of reliability."

*United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98,

109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977).  "Even if the procedure was unnecessarily (or

impermissibly) suggestive . . .[,] a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'" *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

This Court bifurcated the *Wade* hearing, and the government has offered evidence relating only to the issue of the suggestiveness of the procedure. No continuation of the hearing is necessary if the court determines that the procedure was not unduly suggestive. If, on the other hand, the court finds that the procedure was impermissibly suggestive, the hearing must be continued to determine whether the identification has an independent basis of reliability.

On the record before me, I find that the identification procedure was not unduly suggestive. First, the manner in which Bernabei presented the array to the witness did not suggest to the witness which, if any, photograph to select. The record establishes that Bernabei's practice was to instruct the witness to identify any individuals depicted in the array whom the witness knew, if any. Further, the testimony demonstrates that the witness was not instructed that any particular photograph would be included in the array. Further, the testimony establishes that neither Bernabei nor Van Alsytne made any comments or gestures to direct the witness to a particular photograph.

I also find that the array itself was not unduly suggestive. Guzman's photograph is one of six photographs of different Hispanic men of roughly similar ages. All are head shots and feature men with short dark hair, an earring and slight mustaches, some of whom have slight beards. There are few minor differences of lighting and background between some of the photographs. For instance, Guzman's face appears slightly darker than the faces of three of the

other men, as a result of both the quality of the photograph and Guzman's complexion.  Yet,

Guzman's face is similar in complexion to the two remaining men.  In addition, Guzman's

photograph has a similar background hue to two of the other photographs, although three

photographs have a slightly grayer, darker background hue.  I find that these differences in color

and shading do not draw the viewer's eye to Guzman's photograph and are not significant

enough to "suggest to an identifying witness that [the defendant] was more likely to be the

culprit," *Jarrett v. Headley*, 802 F.2d at 41.  *Compare United States v. Douglas*, 525 F.3d 225,

243 (2d Cir.) ("[a]s to the background colors of the photos, no two are the same, and no picture

stands out because of its background color"), *cert. denied*, 555 U.S. 1033 (2008); *United States

v. Bautista*, 23 F.3d at 731 ("[w]hile it is true that the photograph of [the defendant] is slightly

brighter and slightly more close-up than the others, we find that these differences did not render

the array suggestive"); *United States v. Stanley*, 2009 WL 5066864, *6 (E.D.N.Y. 2009) ("the

difference in background colors did not place undue focus on [the defendant] because the filler

backgrounds were not all uniform either") *with United States v. Saunders*, 501 F.3d 384, 390

(4th Cir. 2007) ("[the defendant's] photo stood out sharply from the others in the array [as a

result of] . . . [t]he dark background and lack of overhead lighting"), *cert. denied*, 552 U.S. 1157

(2008); *United States v. Sanchez*, 24 F.3d 1259, 1262 (10th Cir.) ("differences such as

background color can make a picture stand out, and can act to repeatedly draw a witness's eye to

that picture"), *cert. denied*, 513 U.S. 1007 (1994); *United States v. Friedman*, 1996 WL 612456,

*27 (E.D.N.Y. 1996) (array suggestive because "[w]hen [the defendant's] pale complexion and

the background are viewed in conjunction, the effect is quite striking [, . . . making the

defendant's] photograph stand[] out in both arrays in a manner that is extremely distinctive"),

*aff'd in part and rev'd in part on other grounds*, 300 F.3d 111 (2d Cir. 2002), *cert. denied*, 538 U.S. 981 (2003).

Guzman challenges the identification on the grounds that the government did not establish the source of the other five photographs contained in the array or whether the array had previously been used.  (Docket # 39 at 23).  The source of the other photographs is irrelevant because nothing in the record suggests that the witness was familiar with any of the photographs or the array itself.  Guzman maintains that the absence of source information prevents the Court from assessing whether Guzman's physical characteristics, including his build and complexion, were in fact similar to other individuals depicted in the array.  I disagree.  Irrespective of whether Guzman and the other individuals actually shared similar physical characteristics, the physical characteristics depicted in the array are similar.

Guzman also emphasizes that the government has not established that the witness had a reliable basis upon which to identify Guzman.  (*Id.*).  As discussed above, however, in the absence of a suggestive procedure, the Court need not reach the issue of whether the witness had a reliable basis upon which to identify Guzman.

Accordingly, I recommend that the district court deny Guzman's motion to suppress the photographic identification.

## II.    Motion to Suppress Statements

I turn next to Guzman's motion to suppress his post-arrest statements on the grounds that the officers unlawfully entered 24 Holland Street to arrest him without a warrant

and his post-arrest statements were tainted by that unlawful arrest,[6] that he did not knowingly and voluntarily waive his *Miranda* rights before being questioned and that his statements were otherwise involuntary.  (Docket ## 26, 39 at 13).

### A.    Lawfulness of the Arrest

The Fourth Amendment prohibits entry into a third-party's residence in order to effect a warrantless arrest of an individual within that residence, even if the arrest is otherwise supported by probable cause.  *Steagald v. United States*, 451 U.S. 204, 213 (1981); *Payton v. New York*, 445 U.S. 573, 586 (1980).  "The prohibition does not apply, however, to situations in which voluntary consent has been obtained."  *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *United States v. Vasquez*, 638 F.2d 507, 526 (2d Cir. 1980) ("[t]he Fourth Amendment does not permit a warrantless entry into a suspect's home to arrest him unless the circumstances are exigent or an occupant has consented"), *cert. denied*, 450 U.S. 970 (1981).  Statements obtained after an unlawful arrest may be suppressed as fruit of the poisonous tree.  *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

The government argues that the officers lawfully entered 24 Holland Street based upon Guzman's express and implied consent.  (Docket # 41 at 13-17).  During the hearing, Guzman's counsel maintained that the officers could not have reasonably believed that Guzman knowingly consented to their entry into 24 Holland Street because they knew that Guzman had limited understanding of the English language.  (Tr. 97).

Consent "need not be expressed in a particular form, but 'can be found from an individual's words, acts or conduct.'"  *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993) (*quoting Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988)).  The consent need only be

---

[6] Guzman challenges only law enforcement's entry into the house without a warrant, not whether the arrest was supported by probable cause.  Counsel for Guzman confirmed that he was not raising a probable cause challenge in an email communication with the government and the Court on November 26, 2013.

voluntary, that is, obtained without coercion, even if it was given without knowledge of the right to refuse consent.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 241-42 (1973); *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).  The government bears the burden of establishing by a preponderance of the evidence that the consent was voluntary.  *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830 (1981).  "The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search."  *United States v. Isiofia*, 370 F.3d at 231 (internal quotations and citations omitted).

        I find that it was reasonable for the officers to believe that Guzman had consented to their entry into 24 Holland Street.  The evidence establishes that Bernabei and Van Alstyne approached the premises and knocked on the screen door.  Guzman came to the door, and Bernabei and Van Alstyne introduced themselves as members of law enforcement and asked Guzman whether he was alone.  After Guzman responded affirmatively, they asked if they could enter the residence.[7]  Guzman replied, "yeah," and partially opened the screen door for the officers – thus expressing his consent to the entry both verbally and non-verbally.  *See United States v. Grant*, 375 F. App'x 79, 80 (2d Cir.) (defendant demonstrated consent to officers' entry by admitting them into building in response to their request to talk to him), *cert. denied*, 131 S. Ct. 507 (2010); *United States v. Goncalves*, 2008 WL 2080550, *8 (N.D.N.Y. 2008) ("the [c]ourt finds, based on the totality of the circumstances, that when [an individual], in response to [an officer's] inquiry as to where defendant was, stated that defendant was inside, turned around and entered house without further explanation or instruction, and left the doors open behind her,

---

[7] Bernabei testified that he also asked Guzman if they could talk to him, and Guzman responded affirmatively.  That alleged exchange is not captured on the recording, although the recording concludes moments after the officers enter the residence.  In any event, I do not need to reach whether the officers asked if they could talk to Guzman because the government has not identified any statements that it seeks to introduce at trial that were made by Guzman before he was administered and waived his *Miranda* warnings.

she impliedly consented to the officers' entry into the house"); *United States v. Camilo*, 287 F. Supp. 2d 446, 452 (S.D.N.Y. 2003) (consent confirmed when individual "stepped back from the door and held it open as [law enforcement] entered the apartment")  Nothing in the record suggests that law enforcement coerced or tricked Guzman into providing his consent.

I also find that the officers reasonably believed that Guzman was sufficiently conversant in English to understand the officers when they introduced themselves and asked to enter the residence.[8]  When Bernabei and Van Alstyne approached the residence, Guzman was speaking on the telephone in English.  Guzman approached the door and spoke to the officers in English.  When they responded in English, Guzman did not indicate that he did not understand them.  Guzman replied to the officers' questions in English.  Although the investigating agents knew that Guzman frequently spoke Spanish, they also knew that Guzman was conversant in English and communicated with certain people over the phone in English.  Under these circumstances, the officers' belief that Guzman validly consented to their entry was reasonable. *See United States v. Javed*, 2009 WL 536071, *2 (E.D.N.Y. 2009) (consent valid where agents communicated with defendant in English and where defendant replied in English and generally displayed no difficulty understanding English); *United States v. Camilo*, 287 F. Supp. 2d at 452 ("[a]lthough [law enforcement] later determined that [the individual] was more comfortable communicating in Spanish, when they arrived they reasonably believed, based on their exchanges with her at the door, that [the individual] understood English well enough to provide consent to enter the apartment").

---

[8]  Having concluded that the entry into 24 Holland Street was lawful, I need not address the government's and Guzman's attenuation arguments.

**B.**    *Miranda* **Waiver and Voluntariness**

*Miranda* established the well-settled rule that the government may not introduce as evidence a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that privilege. *Miranda v. Arizona*, 384 U.S. 436 (1966). No question exists on the record before the Court that Guzman was in custody and subjected to interrogation during the interview at the Public Safety Building. The question is whether Guzman validly waived his *Miranda* rights.

To establish a valid waiver, the government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). To demonstrate the adequacy of a waiver, the government must do more than provide evidence that a *Miranda* warning was given and that the defendant thereafter made an uncoerced statement. *See Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). The government "must make the additional showing that the accused understood the[] rights." *See id.* Accordingly, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.*

In examining whether a statement was made voluntarily, a court must consider the totality of the circumstances in which it was given "to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about [statements] not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.) (quoting *United States*

*v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert. denied*, 510 U.S. 1003

(1993).  In evaluating the totality of the circumstances, the court must assess:  "(1) the

characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law

enforcement officials."  *United States v. Awan*, 384 F. App'x 9, 14 (2d Cir. 2010) (quoting *Green*

*v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)), *cert. denied*, 131

S. Ct. 969 (2011).  Where circumstances suggest evidence of "brutality, [p]sychological duress,

threats, [or] unduly prolonged interrogation," statements will be deemed involuntary.  *United*

*States v. Moore*, 670 F.3d 222, 233 (2d Cir.) (alteration in original) (quoting *United States v.*

*Verdugo*, 617 F.3d 565, 575 (1st Cir. 2010)), *cert. denied*, 133 S. Ct. 48 (2012).

On the record before me, principally the credible testimony of Bernabei and Diaz,

I find that Guzman was properly advised of his *Miranda* rights and voluntarily waived them

before speaking to the officers.  Bernabei testified that after the officers arrested Guzman and

transported him to the Public Safety building, Guzman was placed without handcuffs in an

interview room.  Guzman was offered water and the opportunity to use the restroom.  Diaz

testified that after law enforcement introduced themselves to Guzman, Diaz advised him in

Spanish of his *Miranda* rights and asked him whether he understood those rights.

Bernabei testified that after Guzman had indicated in English and in Spanish that

he understood his rights, Hoffman read the *Miranda* rights in English from another rights card.

Hoffman asked Guzman whether he understood the rights and whether he would talk to the

officers.  Guzman responded affirmatively in English to both questions.  Guzman showed no

signs of intoxication or incoherence during the interview, nor did he request an attorney or the

cessation of questioning.  Bernabei and Diaz both described Guzman as calm and cooperative

during the interview.  I further find that law enforcement did not make any threats or promises in order to induce Guzman to speak.

I reject Guzman's contention that suppression of his statements is warranted because Diaz failed to pose the second waiver question on the rights card in Spanish.  Hoffman did ask Guzman the second waiver question – whether Guzman would agree to speak with law enforcement with knowledge of his rights – in English, and Guzman responded affirmatively. "[I]t is well settled in the Second Circuit that the existence of limitations on English language skills does not preclude a defendant from knowingly and voluntarily waiving his or her *Miranda* rights."  *United States v. Jabu*, 2012 WL 5389937, *5 (E.D.N.Y. 2012) (collecting cases).

The evidence demonstrates that Guzman was read the *Miranda* rights in English, asked the two waiver questions in English, and responded affirmatively in English to both. Although Guzman contends that he has limited understanding of the English language, the record convincingly establishes that Guzman was reasonably conversant in English.  Guzman was overheard conversing in English during many intercepted telephone conversations, he spoke to the officers at 24 Holland Street in English, and he spoke English approximately 90% of the time during the two-hour post-arrest interview.  The fact that Guzman indicated when he wanted Diaz to translate to Spanish suggests that Guzman understood the rest of the questions without the need for translation.  Taken together, the evidence establishes that Guzman's facility with the English language was adequate to knowingly waive his *Miranda* rights.  *See United States v. Jaswal*, 47 F.3d at 542 (waiver was knowing and voluntary where "defendants were found to have a reasonably good command of the English language"); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989) ("[e]ven though [defendant's] proficiency in the English language may have been limited, it did not prevent him from making a knowing and intelligent waiver of

19

his constitutional rights [where] . . . his command of English was sufficient for him to have understood the *Miranda* warnings given to him"), *cert. denied*, 499 U.S. 949 (1991); *United States v. Juvenile Male*, 968 F. Supp. 2d 490, 506 (E.D.N.Y. 2013) (finding knowing and voluntary waiver despite failure of law enforcement to read rights in Spanish; "the overwhelming evidence indicates that the defendant does, in fact, have a reasonably good command of the English language [and] . . . was able to be questioned, to communicate, and to knowingly and voluntarily waive his *Miranda* rights in English"); *United States v. Jabu*, 2012 WL 5389937 at *7 ("[u]nder these circumstances, in particular [defendant's] ability to participate (in English) in extensive and substantive English-only interactions with [law enforcement], the court finds that the preponderance of the evidence establishes that [defendant's] English-language skills were sufficient to enable him to knowingly, voluntarily, and intelligently waive his *Miranda* rights pursuant to this Circuit's controlling precedent").

   In any event, Guzman was advised in Spanish of his *Miranda* rights and indicated to Diaz that he understood his rights.  That Diaz did not read the second waiver question in Spanish does not warrant suppression of Guzman's statements because Guzman indicated that he understood his rights and answered the officers' questions.  *See United States v. Boon*, 2013 WL 6837312, *18 (W.D.N.Y. 2013) (defendant waived *Miranda* rights even though law enforcement did not expressly ask defendant if she agreed to waive her rights where defendant signed a waiver form and proceeded to speak with law enforcement); *United States v. Cleveland*, 2013 WL 4759081, *9 (W.D.N.Y.) ("[law enforcement's] failure to read the last question on the rights card in order to obtain an explicit answer from [defendant] to the waiver question does not require suppression"[;] . . . [defendant] was advised of his rights, stated that he understood his rights and agreed to speak with [law enforcement][;] [s]uch facts establish that [defendant]

knowingly and voluntarily waived his rights – whether he did so explicitly or implicitly"), *report and recommendation adopted*, 2013 WL 6440949 (W.D.N.Y. 2013).

   The credible testimony also establishes that Guzman's waiver and subsequent statements were voluntary.  As an initial matter, the circumstances of Guzman's arrest did not involve any display of force or other coercive or intimidating characteristics.  Further, nothing in the record suggests that Guzman's age or characteristics rendered him particularly vulnerable to coercion, or that he was intoxicated, sick or in pain.  Indeed, both Diaz and Bernabei testified that Guzman was calm and cooperative throughout the interview, appeared to understand the questioning and provided coherent answers.  In addition, both officers testified that neither they, nor any other members of law enforcement, made any promises to or threatened or coerced Guzman in order to induce him to speak.  Finally, the conditions under which the statements were made do not suggest that Guzman was subjected to any undue influence to coerce a statement.  Although Guzman was detained for approximately four hours in an interview room at the Public Safety Building, the evidence shows that Guzman was offered beverages and opportunities to use the restroom.

   On this record, I recommend that the district court deny Guzman's motion to suppress the statements he made on March 28, 2013.

## CONCLUSION

For the reasons stated above, I recommend that Guzman's motions to suppress statements and evidence of the photographic identification **(Docket # 26)** be **DENIED**.

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
November 17, 2014

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[9]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                                        *s/Marian W. Payson*
                                        MARIAN W. PAYSON
                                        United States Magistrate Judge

Dated: Rochester, New York
            November 17, 2014

---

[9] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).